IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**RICHMOND CITY SCHOOL BOARD,**

    Plaintiff,

    v.                                  **Civil Action No. 3:24cv698**

**V.B.,** *a minor, by and through her mother and*
*next friend, Vanessa Black,*

    Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on two motions:

1.     Plaintiff Richmond City School Board's ("RPS") Motion for Judgment on the Administrative Record, (ECF No. 14); and

2.     Defendant V.B.'s[1] Motion to Dismiss and *Pro Se* Countersuit for Sanctions, Damages, and Ethical Violations (the "Motion to Dismiss"), (ECF Nos. 16, 17).[2]

On October 3, 2024, RPS filed a four-Count Complaint before this Court challenging the results of a due process hearing conducted under the Individuals with Disabilities Education Act ("IDEA"). (ECF No. 1.)[3] In its Motion for Judgment on the Administrative Record, RPS reiterated the arguments included in its Complaint and contended that the due process Hearing

---

[1] V.B. is a minor proceeding by and through her mother and next friend, Vanessa Black ("Parent"). Because V.B. is a minor, the Court does not refer to V.B. by her full name.

[2] V.B. filed two identical versions of her Motion to Dismiss. (ECF Nos. 16, 17.) In describing V.B.'s arguments, the Court cites only ECF No. 16.

[3] RPS' Motion for Judgment on the Administrative Record relies on the administrative record of the due process hearing. RPS filed the Administrative Record ("AR") before this Court under seal. (ECF Nos. 10, 11.) When citing to the Administrative Record, the Court employs the pagination of the Administrative Record rather than that of the CM/ECF docketing system. When citing to documents other than the Administrative Record, the Court employs the pagination assigned by the CM/ECF docketing system.

Officer (1) incorrectly determined that RPS failed to provide V.B. with the protections mandated by the IDEA; (2) incorrectly concluded that RPS failed to refer V.B. with sufficient speed for evaluations for special education services; and, (3) improperly ordered that, as relief for these IDEA violations, independent educational evaluators must conduct V.B.'s evaluations for special education services. (ECF No. 15, at 15–27.) In her Motion to Dismiss, V.B. asserted that RPS failed to state claim and contended that RPS engaged in sanctionable conduct. (ECF No. 16, at 1–4.)

On March 31, 2026, the Court entered an order granting in part and denying in part RPS' Motion for Judgment on the Administrative Record. (ECF No. 21.) The Court concluded that while the due process Hearing Officer properly determined that RPS violated the requirements of the IDEA, the Hearing Officer ordered improper relief by requiring independent educational evaluators to perform V.B.'s evaluations for special education services. The Court therefore granted RPS' Motion for Judgment on the Administrative Record only with respect to RPS' first Count concerning the relief awarded by the Hearing Officer, but ordered RPS to provide the Court with supplemental briefing concerning the proper remedy the Court may order. (ECF No. 21, at 1–2.) The Court denied RPS' Motion for Judgment on the Administrative Record with respect to the remaining three Counts in its Complaint. (ECF No. 21, at 2.) The Court further denied V.B.'s Motion to Dismiss. (ECF No. 21, at 2.)

The Court now enters this Memorandum Opinion articulating its reasons for its partial grant of the Motion for Judgment on the Administrative Record and its denial of V.B.'s Motion to Dismiss.

## I. Legal, Factual, and Procedural Background

### A.    Legal Background

#### 1.    Statutory Background:  The Individuals with Disabilities Education Act

The IDEA was designed "to ensure that all children with disabilities have available to them a free appropriate public education [("FAPE")] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).  To do so, Congress provides funding to states to build IDEA programs that support students with disabilities.  In order to receive those funds, states must comply with certain requirements.

#### a.    "Child Find" Obligations Under the IDEA

One such requirement is that states receiving federal funds must maintain "Child Find" policies ensuring that "[a]ll children with disabilities residing in the State . . . who are in need of special education and related services, are identified, located, and evaluated" for such services.  20 U.S.C. § 1412(a)(3)(A).  There is no standard included in the IDEA nor in its implementing regulations governing how quickly a school district must fulfill its Child Find obligations, and the United States Court of Appeals for the Fourth Circuit has not imposed one.[4]

---

[4] The United States Court of Appeals for the Fifth Circuit has read a "reasonable-time standard" into 20 U.S.C. § 1412(a)(3)(A). *Dallas Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 320 (5th Cir. 2017); *Spring Branch Indep. Sch. Dist. v. O.W. by Hannah W.*, 961 F.3d 781, 791 (5th Cir. 2020).  Similarly, the United States Court of Appeals for the Third Circuit has held that the IDEA does not "establish a deadline by which time children who are suspected of having a qualifying disability must be identified and evaluated, but [it has] infer[red] a requirement that this be done in a reasonable time after school officials are on notice of behavior that is likely to indicate a disability." *W.B. v. Matula*, 67 F.3d 484, 501 (3rd Cir. 1995) (holding that a jury could reasonably find a violation of Child Find where a school failed to conduct an evaluation within six months after the personal observations of teachers and the receipt of information from parents provided notice of the student's likely disability), *abrogated in part on other grounds by A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791 (3d Cir. 2007).

3

The IDEA's implementing regulations further define what a state's Child Find program must consist of. 34 CFR § 300.111(a)(1)(i). States must implement their own regulations consistent with the requirements of the IDEA and its implementing regulations. Relevant to this case, the Commonwealth of Virginia has promulgated regulations outlining that, pursuant to the IDEA's Child Find requirements, "[e]ach local school division shall maintain an active and continuing child find program designed to identify, locate and evaluate those children . . . who are in need of special education and related services." 8 Va. Admin. Code § 20-81-50(A)(1).

### b.   "Child Study" Teams

As part of Virginia's Child Find process, Virginia schools must also maintain "procedures to process in a timely manner all referral requests for a child suspected of having a disability." 8 Va. Admin. Code § 20-81-50(D). If a parent or the school suspects a child has a disability, the parent or the school must refer the child to a "Child Study" team, which decides whether to evaluate the child further to determine whether the child has a disability. 8 Va. Admin. Code § 20-81-60(A).

### c.   Initial Evaluations Under the IDEA

Child Study teams' evaluations of children with suspected disabilities are subject to the requirements of the IDEA. Before providing children with disabilities with special education services, schools must conduct a full and individual evaluation to determine a student's eligibility for those services under the IDEA. 20 U.S.C. § 1414(a)(1)(a). The IDEA's implementing regulations further provide that "[e]ach public agency must conduct a full and individual evaluation, in accordance with [34 C.F.R.] §§ 300.304 through 300.306, before the

4

initial provision of special education and related services to a child with a disability." 34 C.F.R. § 300.301(a).[5]

Under the IDEA, a state educational agency ("SEA")[6] or local educational agency ("LEA")[7] must conduct a full and initial evaluation of a student before finding a student eligible for special education. Each SEA or LEA "shall conduct a full and individual initial evaluation . . . before the initial provision of special education and related services to a child with a disability." 20 U.S.C. § 1414(a)(1)(A). As part of that initial evaluation, SEA or LEA evaluators "shall . . . review existing evaluation data on the child . . . and . . . on the basis of that review . . . identify what additional data, if any, are needed." *Id.* § 1414(c)(1)(A)–(B). The SEA or LEA must also "administer such assessments and other evaluation measures as may be needed to produce the data" that the LEA determined was "needed" under the statute. *Id.* § 1414(c)(2).

The IDEA also provides that SEAs or LEAs must "maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards." 20 U.S.C. § 1415(a). SEAs or LEAs must maintain procedures providing "[a]n opportunity for the parents of a child with a disability . . . to obtain an independent educational evaluation of the child." *Id.*

---

[5] Virginia regulations include corresponding requirements concerning initial evaluations. 8 Va. Admin. Code § 20-81-70(B).

[6] As defined in the IDEA, a state educational agency "means the State board of education or other agency or officer primarily responsible for the State supervision of public elementary schools and secondary schools, or, if there is no such officer or agency, an officer or agency designated by the Governor or by State law." 20 U.S.C. § 1401(a)(32).

[7] As defined in the IDEA, a local educational agency "means a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for such combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary schools or secondary schools." 20 U.S.C. § 1401(a)(19).

§ 1415(b)(1). But parents' entitlement to an independent evaluation is not boundless. The regulations implementing the IDEA "clarify this entitlement by providing that a 'parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency.'" *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 60–61 (2005) (quoting 34 C.F.R. § 300.502(b)(1)).[8]

### d.    Creation of an Individualized Education Program Under the IDEA

Upon a determination that a student has a disability and is therefore eligible for special education services, the school district is required to develop an Individualized Education Program ("IEP") through cooperation between parents and school officials. 20 U.S.C. § 1414(a)(4)–(5). An IEP is a comprehensive document prepared by teachers, school officials, and parents that spells out a personalized plan to meet all of the child's educational needs. 20 U.S.C. § 1414(d)(1)(A)–(B). An IEP must detail the student's current educational status, set forth annual goals for the student's education, and state the special educational services and other aids that will be provided to the child as well as the extent to which the child will be placed into a "regular class." *Id.* § 1414(d)(1)(A). To assure that students with disabilities receive FAPEs, the IDEA requires that school districts provide IEPs for each disabled child. *Id.* § 1414(d).

### e.    Manifestation Determination Reviews Under the IDEA

One key protection of the IDEA (in addition to IEPs) is that when a student *with a disability* violates a student code of conduct, the relevant LEA must coordinate with the student's parent and the individuals in charge of the student's IEP to determine whether the student's

---

[8] Virginia regulations include corresponding procedural safeguards. 8 Va. Admin. Code § 20-81-170(B)(2)(a).

conduct "was caused by, or had a direct and substantial relationship to, the child's disability, or if the conduct in question was the direct result of the [LEA's] failure to implement the [student's] IEP." 20 U.S.C. § 1415(k)(1)(E)(i)(I)–(II). This determination occurs in a Manifestation Determination Review ("MDR").[9] The parties must conduct an MDR "within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct." *Id.*

An SEA or LEA must conduct an MDR when it has knowledge that a child has a disability. The IDEA's implementing regulations provide that an SEA or LEA "must be deemed to have knowledge that a child is a child with a disability if" the SEA or LEA was put on notice of that disability "before the behavior that precipitated the disciplinary action occurred." 34 C.F.R. § 300.534(b). These regulations further provide that an SEA or LEA had knowledge of child's disability prior to a disciplinary action in three circumstances: (1) the parent of the child "expressed concern in writing to supervisory or administrative personnel of the appropriate educational agency, or a teacher of the child, that the child is in need of special education and related services"; (2) the parent of the child "requested an evaluation of the child pursuant to [34 C.F.R.] §§ 300.300 through 300.311"; or, (3) the teacher of the child, "or other personnel of the LEA, expressed specific concerns about a pattern of behavior demonstrated by the child directly to the director of special education of the agency or to other supervisory personnel of the agency." 34 C.F.R. § 300.534(b)(1)–(3).[10]

---

[9] Virginia regulations include corresponding requirements for MDR procedures. 8 Va. Admin. Code § 20-81-160(D).

[10] The IDEA itself contains identical provisions concerning a school's knowledge of a child's disability. *See* 20 U.S.C. 1415(k)(5)(B).

In an MDR, the parties review "all relevant information in [a] student's file," including "the Child's IEP, any teacher observations, and any relevant information provided by the parents to determine if the conduct in question was by, or had a direct and substantial relationship to, the child's disability." *Id.* § 1415(k)(1)(E)(i)(I).

###### f.    Due Process Hearings Under the IDEA

The IDEA allows parents to "present a complaint . . . with respect to any matter relating to the identification, evaluation, or educational placement of the child," and it directs states to provide a "due process hearing" for parents who disagree with school authorities' decisions on such a complaint.  20 U.S.C. § 1415(b)(6), (f).[11]

---

[11] Virginia regulations include corresponding requirements governing due process hearings. *See generally* 8 Va. Admin. Code § 20-81-210.

**B.      Factual Background[12]**

During the 2023–2024 academic school year, V.B. began kindergarten at George W. Carver Elementary School ("Carver"), an elementary school operated and maintained by RPS. (AR, at 986.)  Prior to enrolling at Carver, V.B. was "removed from two daycares" as a result of behavioral issues.  (AR, at 986.)  At the beginning of the school year, Parent orally reported to RPS that V.B. had an ADHD diagnosis, (AR at 986, 322:3–6), but she did not provide RPS with documentation of that diagnosis until a disciplinary hearing on March 12, 2024, (AR, at 987).

**1.      V.B.'s Behavior While Attending Carver**

While at Carver, V.B. struggled with behavioral issues and misbehaved regularly.  (*See* AR, at 986–97 (detailing various incidents).)  A review of V.B.'s behavioral record that was maintained by her teacher, Christina Wilson ("Teacher Wilson"), indicates that V.B.'s behavior

---

[12] The Court's recitation of the facts underlying RPS' Motion for Judgment on the Administrative Record relies on the facts as found by a hearing officer during a due process hearing concerning V.B.'s rights under the IDEA.  In reviewing an IDEA claim, the Court must treat "a hearing officer's findings of fact [as] *prima facie* correct" so long as they are "regularly made."  *E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 517 (4th Cir. 2014) (citing *J.P. ex rel. Peterson v. Cnty. Sch. Bd.*, 516 F.3d 254, 259 (4th Cir. 2008)).

Factual findings are not regularly made if "they are reached through a process that is 'far from the accepted norm of a fact-finding process.'"  *Cnty. Sch. Bd. of Henrico Cnty., Va. v. Z.P. ex rel. R.P.*, 399 F.3d 298, 305 (4th Cir. 2005).  "In the Fourth Circuit, administrative findings are regularly made if the hearing officer conducted a proper hearing, allowing the parents and the School Board to present evidence and make arguments, and the hearing officer by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case."  *C.D. v. Arlington Cnty. Sch. Bd.*, No. 1:23-cv-1627 (LMB), 2025 WL 350222, at *13 (E.D. Va. Jan. 30, 2025) (quotation omitted), *aff'd on other grounds*, 2026 WL 579466 (4th Cir. Mar. 2, 2026).  As discussed below, the Court determines that the hearing officer's factual findings in this matter were "regularly made," meaning the Court owes deference to the hearing officer's factual findings.

often included spitting on others; yelling and screaming; cursing; physical aggression; getting out of her seat without authorization; and refusing to listen.[13] (AR, at 986, 1074–78.)

But V.B.'s behavior fluctuated, and at points, improved. (AR, at 656:10–14, 987, 1080.) For example, Teacher Wilson reported only six incidents of misbehavior in October 2023. (AR, at 1074.) On October 25, 2023, Teacher Wilson wrote to Parent: "Some days she does well, other days she does not. However, I am so proud of the progress she has made since the first week of school." (AR, at 1083.) At other times, V.B.'s behavioral concerns persisted. From September 6, 2023 to February 28, 2024, Teacher Wilson reported over forty incidents of V.B. engaging in inappropriate behavior. (AR, at 11–12, 1079–92.)

Teacher Wilson did not always report V.B.'s behavioral issues to Carver administration. (AR, at 650:8–11, 693:12–16.) In fact, Teacher Wilson did not formally report V.B.'s misbehaviors to Carver's administrative staff until November 14, 2023 when V.B. received a conduct referral, her first documented disciplinary infraction. (AR, at 11, 650:8–11.)

Carver later suspended V.B. on at least four occasions. On December 14, 2023, V.B. received her first documented short-term suspension ("STS"). (AR, at 11.) On January 28, 2024 and February 21, 2024, V.B. received separate one-day suspensions. On February 29, 2024, V.B. received a ten-day suspension. (AR, at 986.)

As discussed below, V.B. ultimately pursued a due process hearing under the IDEA. During that hearing, Hearing Officer Rhonda Mitchell ("Hearing Officer Mitchell") found Carver's record of V.B.'s attendance and conduct history "unclear." (AR, at 990.) During the due process hearing, V.B.'s grandmother ("Grandparent") testified that V.B. was "put out of

---

[13] Teacher Wilson documented V.B.'s behavioral issues using a monthly calendar chart and reported behavioral updates to Parent through the Remind Messaging App. (AR, at 1079–92.)

school" by "word of mouth, a few times, maybe three times," and that Carver would often request that V.B. be picked-up early.  (AR, at 213:2–4, 224:5–7.)  Parent similarly testified that "V.B. was probably suspended from school since school started every other week" for one to three days at a time.  (AR, at 310:1–3.)

### 2.    Interventions to Address V.B.'s Behavior

In response to V.B.'s behavioral issues, Teacher Wilson employed several classroom interventions to manage V.B.'s behavior.[14]  (AR, at 986.)  Teacher Wilson used a color system to incentivize good behavior and a calendar system to track V.B.'s behavior.  (AR, at 1074–1078, 1083.)  In addition to Teacher Wilson, Carver's school counselor and a social worker would check-in with V.B., and V.B. was provided with breaks.  (AR, at 693:17–20.)

Parent also proactively registered V.B. for therapeutic day treatment ("TDT") services through SUCCOR,[15] which was available to her through Medicaid.  (AR, at 317:11–318:15.)  As explained to Parent at an open house, TDT was "supposed to help [] kids and get them to focus

---

[14] The classroom interventions were part of a three-tiered intervention system that Carver employs, which is designed to address a student's academic and behavioral issues relying on data RPS obtains from different assessments.  (AR, at 533:1–3.)  During V.B.'s due process hearing, Dr. Jazmine Pitts, Instructional Compliance Coordinator at Carver ("ICC Pitts"), described this tiered system.

Tier 1 contains interventions for "all students in the general education classroom, not being pulled out for any type of interventions or anything, but getting that instruction in a whole group."  (AR, at 533:20–24.)  Tier 2 focuses on individualized interventions for "kids that just need a little bit of extra push . . . to get them kind of over the hump to be in Tier 1."  (AR, at 534:1–4.)  Tier 3 focuses on "individuals who require more interventions, possibly an IEP, or other accommodations in the classroom setting to be successful."  (AR, at 534:6–9.)  One goal of the tiered system is to counteract the over-identification of minority students as special education students.  (AR, at 979.)

RPS engaged in tier-three interventions for V.B.  (AR, at 763:6–18.)

[15] SUCCOR is a behavioral health services program.

and talk about their feelings." (AR, at 317:9–22.)  Although TDT services were primarily provided after school, a TDT counselor, Angela Thompson ("Counselor Thompson"), accompanied V.B. during the school day for one to two hours approximately two times per week. (AR, at 318:16–319:9, 644:18–22.)  With Counselor Thompson present, V.B.'s "behaviors were nowhere near as frequent," but Counselor Thompson could not provide V.B. with one-on-one services every day or all day because Counselor Thompson had other schools to service and V.B. was not her only student.  (AR, at 319:2–9, 644:18–645:6.)

Grandparent was also very involved in addressing V.B.'s behavioral concerns.  In September 2023, Grandparent ate lunch with V.B. each day for "three or four weeks" until Carver staff revoked her permission to do so.  (AR, at 186:11–187:11.)

Despite these interventions, in November 2023, V.B.'s behavioral issues escalated.  (AR, at 987, 1076–77.)  On November 3, 2023, Teacher Wilson reported to Parent that "old behaviors are starting to pop up."  (AR, at 1085.)  Teacher Wilson documented instances of physical or verbal aggression, difficulty exhibiting self-control, and difficulty following directions nearly every day in November and December of 2023.  (AR, at 1076–77, 1085–89.)

RPS convened a School Based Intervention Team ("SBIT") to address V.B.'s continued behavioral issues.[16]  (AR, at 987.)  On December 22, 2023, the SBIT team met with V.B.'s family, Teacher Wilson, and V.B.'s case managers to develop goals and strategies to better manage V.B.'s behavior.  (AR, at 544:24–545:9, 697:18–699:17.)  The SBIT decided to refer V.B. to a Child Study team.  (AR, at 544:15–20, 987.)

---

[16] RPS did not implement a Behavior Intervention Plan ("BIP") or a safety plan, although Carver's Assistant Principal Tonya Harris-Jones ("Assistant Principal Harris-Jones") testified during the due process hearing that either "would have been appropriate." (AR, at 697:18–699:17.)

On January 11, 2024, RPS initiated the Child Find process and held a meeting "to review the referral and establish what data was needed" for V.B.'s eligibility for special education services. (AR, at 545:10–546:3, 694:5–8, 987.) Parent consented to the SBIT's recommendation for an initial evaluation of V.B.'s eligibility for special education services. (AR, at 987.)

### 3.    Incident on February 28, 2024

Prior to the completion of her evaluation for eligibility for special education services, V.B. received more disciplinary infractions for aggression toward other students. On February 28, 2024, V.B. hit Teacher Wilson with a closed fist. (AR, at 12, 987.) Teacher Wilson described the incident in V.B.'s Conduct History Form:

> [V.B.] was throwing all of her items out of her chair pocket and [Teacher Wilson] asked [V.B.] to pick them up, [V.B.] refused. So after [Teacher Wilson] got the rest of the class on task with their independent work, [Teacher Wilson] went over to pick up the items [V.B.] had flung all over the floor, along with [V.B.'s] activity sheets that were everywhere. After [Teacher Wilson] picked them up, [Teacher Wilson] told [V.B.] that [Teacher Wilson] was going to contact [V.B.'s] mom, so as [Teacher Wilson] was turning away to place them on top of [her] mailbox cubbies, [V.B.] struck [Teacher Wilson] with her fist on [Teacher Wilson's] right hip and said that's what [Teacher Wilson] get[s].

(AR, at 12.)

As a result of hitting Teacher Wilson, V.B. received a 10-day short-term suspension from February 29, 2024 to March 13, 2024. (AR, at 12, 986.)

### 4.    RPS' Response to V.B.'s Misconduct on February 28, 2024

RPS conducted an MDR on March 1, 2024—one day after V.B.'s suspension began—to determine if V.B.'s conduct in hitting Teacher Wilson was a manifestation of a disability. (AR, at 987, 572:12–573:11.) Relying on Teacher Wilson's classroom data, RPS determined that V.B.'s conduct in hitting Teacher Wilson was not a manifestation of a disability because RPS did not find that V.B.'s conduct was impulsive and instead "felt like it was retaliat[ory] because

13

[V.B.] wasn't getting her way." (AR, at 577:4–6, 594:7–12, 597:11–18.) Because V.B.'s conduct was not considered a manifestation of a disability, the matter proceeded to a disciplinary hearing before Disciplinary Review Hearing Officer Dr. Robin Dalton ("DRHO Dalton"). (AR, at 987.)

On March 12, 2024, the day before V.B.'s short-term suspension ended, DRHO Dalton held the disciplinary hearing and prepared a letter summarizing their determinations. (AR, at 987, 1059–60.) In the letter, DRHO Dalton charged "[V.B.] with violation of Standard(s) of the Standards of Student Conduct:  BESO4 – Striking Staff – using force against a staff member." (AR, at 1059.) DRHO Dalton determined that V.B. could return to Carver on March 13, 2024 but explained that further serious infractions could result in V.B. being reassigned to another school. (AR, at 1059.) But after the disciplinary hearing, V.B. did not return to Carver. (AR, at 987.)

### 5.    Parent's Refusal to Cooperate with RPS' Evaluations of V.B.

On March 25, 2024, during a phone call with Carver administrators, V.B. and Parent's advocate, Dr. Kandise Lucas ("Advocate Lucas"),[17] communicated that V.B. would not return to Carver for instruction or eligibility evaluations. (AR, at 22, 26, 987.)

On March 28, 2024, two weeks after V.B. had not returned to school, Carver's Instructional Compliance Coordinator, Dr. Jazmine Pitts ("ICC Pitts"), and Assistant Principal Tonya Harris-Jones ("Assistant Principal Harris-Jones"), called Parent to make an effort to complete V.B.'s evaluations for special education eligibility. (AR, at 555:17–557:1, 987.)

---

[17] The Court notes that Advocate Lucas has been enjoined from participating in any way, directly or indirectly, in any IDEA cases filed within a court in the Eastern District of Virginia, Richmond Division. *Henrico Cnty. Sch. Bd. v. Matthews*, No. 3:18-cv-110 (REP), ECF No. 221, at 1–2 (E.D. Va. Oct. 2, 2019).

Parent answered ICC Pitts' phone call but stated only that communications regarding V.B. would have to be submitted to her through email because Advocate Lucas was not on the call. (AR, at 555:22–25, 987.)

ICC Pitts emailed Parent to ask if she would agree to V.B. being evaluated at a mutually agreed upon location to conduct the meeting. (AR, at 987.) Parent did not respond. (AR, at 556:20–557:1.) On April 16, 2024, ICC Pitts sent another email to Parent. (AR, at 987.) Again, Parent did not respond. (AR, at 987.) V.B. has not returned to Carver since February 28, 2024. (AR, at 987.)

### 6.    V.B. Initiated a Due Process Hearing Concerning RPS' Interventions

On July 9, 2024, Parent filed a request for an IDEA due process hearing concerning RPS' handling of V.B.'s behavioral concerns. (AR, at 28.) On July 10, 2024, Rossi Volley, Director of Exceptional Education ("Director Volley"), formally appointed Hearing Officer Mitchell to oversee the due process hearing. (AR, at 965.) On July 19, 2024, RPS responded to the allegations in Parent's request for a due process hearing. (AR, at 67–81.)

On August 26 and 27, 2024, Hearing Officer Mitchell conducted the due process hearing. (AR, at 966.) Hearing Officer Mitchell, Advocate Lucas, V.B., Parent, Grandparent, counsel for RPS, Director Volley, and Brian Miller, case monitor appointed by the Virginia Department of Education, were present for each day of the hearing. (AR, at 966.) Grandparent, Family Outreach Coordinator Michelle Williams, and Parent testified on behalf of V.B. ICC Pitts, Assistant Principal Harris-Jones, and Director Volley testified on behalf of RPS. (AR, at 966.)

15

### 7. Hearing Officer Mitchell Concluded that RPS Violated its Child Find Obligations and Failed to Provide V.B. with Disciplinary Protections Required by the IDEA

Hearing Officer Mitchell reached three conclusions relevant to RPS' Motion for Judgment on the Administrative Record.

First, Hearing Officer Mitchell concluded that RPS had knowledge of V.B.'s disability prior to its referral of V.B. to Child Study. (AR, at 988–91.) As observed by Hearing Officer Mitchell, certain protections of the IDEA only apply to a child with a disability if a school has knowledge of that child's disability. (AR, at 988–89 (citing 34 C.F.R. § 300.534).) Hearing Officer Mitchell concluded that "[f]rom the beginning of [V.B.'s time in] school, the evidence indicate[d] that [V.B.'s] teacher noticed [V.B.'s] behavioral problems." (AR, at 989.) Hearing Officer Mitchell noted many instances prior to December 2024 in which RPS had been informed of V.B.'s behavioral conduct such that RPS had knowledge that V.B. was a child with a disability. (AR, at 988–91.) Accordingly, Hearing Officer Mitchell determined that RPS had knowledge of V.B.'s disability, meaning the IDEA's protections applied to V.B. (AR, at 991.)

Second, Hearing Officer Mitchell concluded that despite its knowledge of V.B.'s disability, RPS failed to provide her with the protections afforded by the IDEA. (AR, at 991.) According to Hearing Officer Mitchell, "RPS did not afford [V.B.] the protections of 34 C.F.R. § 300.534 until a MDR was conducted on March 1, 2024, following an incident when [V.B.] hit her teacher on February 28, 2024 that resulted in a 10 day suspension." (AR, at 990.) Hearing Officer Mitchell determined that "the MDR team questionably found that [V.B.'s] actions were not a manifestation of her disability." (AR, at 990.) Hearing Officer Mitchell therefore "[did] not accept the MDR results" while acknowledging that "RPS did the right thing by conducting an MDR." (AR, at 990.) Importantly, Hearing Officer Mitchell determined that V.B. should

16

have been afforded the protections of the IDEA *before* RPS provided V.B. with this MDR. According to Hearing Officer Mitchell, given her record of multiple suspensions prior to March 2024, V.B. had been suspended for more than ten days well before the February 28, 2024 incident, which Hearing Officer Mitchell concluded constituted a "change in placement" that would otherwise require RPS to provide V.B. with an MDR. (AR, at 991.) As a result, because RPS failed to provide V.B. with an MDR at an earlier date, RPS also failed to provide V.B. with the protections of the IDEA. (AR, at 990–91.)[18]

Third, Hearing Officer Mitchell concluded that RPS failed to refer V.B. in a timely fashion for an evaluation to determine her eligibility for special education services. (AR, at 992–96.) Based on this conclusion, Hearing Officer Mitchell ordered that V.B. would be "promptly referred to an [independent] eligibility team to determine if she [was] eligible for special education services based on existing data." (AR, at 997.) Hearing Officer Mitchell further ordered that in the event that results from the Independent Education Evaluations ("IEE") were not received by Carver by November 1, 2024, appropriate personnel from RPS would conduct evaluations that were outlined in Hearing Officer Mitchell's Augst 28, 2024 Interim Order. (AR,

---

[18] Hearing Officer Mitchell determined that V.B. "should have been afforded the protections of 34 C.F.R. § 300.534," but did not state expressly which of those protections V.B. had been denied. (AR, at 991.) 34 C.F.R. § 300.534 provides that certain children with disabilities are entitled to *various* protections of the IDEA, including MDRs.

Hearing Officer Mitchell explained prior to her final determination that V.B. had only been afforded "the protections of 34 C.F.R. § 300.534" when RPS conducted its first and only MDR. (AR, at 990.) Moreover, Hearing Officer Mitchell concluded that V.B. had been subject to a "change in placement," a determination relevant only to whether a school must provide a student with an MDR. *See* 34 C.F.R. § 300.530(e)(1) (providing for MDRs "[w]ithin 10 days of any decision to *change the placement* of a child with a disability") (emphasis added). Despite Hearing Officer Mitchell's failure to explain *which* protections RPS had denied V.B., the Court interprets her decision to center on RPS' failure to conduct an earlier MDR.

at 997.) That Order, in turn, required V.B. to undergo "sociocultural, psychological, and speech-language" evaluations. (AR, at 1008–09.)

## C.    Procedural Background

On October 3, 2024, RPS timely filed its four-count Complaint in this Court challenging Hearing Officer Mitchell's decision. RPS challenged her decision on several grounds:

Count I:     Hearing Officer Mitchell's order requiring independent evaluators to conduct V.B.'s initial evaluation under the IDEA vitiated RPS' right to conduct its own evaluations before determining V.B.'s eligibility for special education services. (ECF No. 1 ¶¶ 43–50.)

Count II:    Hearing Officer Mitchell erred by finding that RPS denied V.B. disciplinary protections under 34 C.F.R. § 300.354. (ECF No. 1 ¶¶ 51–57.)

Count III:   Hearing Officer Mitchell erred by finding that V.B.'s behavioral conduct was a manifestation of her disability. (ECF No. 1 ¶¶ 58–65.)

Count IV:    Hearing Officer Mitchell erred by finding that RPS violated its Child Find obligations by waiting until December 22, 2023 to refer V.B. to Child Study. (ECF No. 1 ¶¶ 66–73.)

RPS requested that the Court reverse and vacate Hearing Officer Mitchell's decision; order that Parent fully cooperate with RPS in conducting V.B.'s initial eligibility evaluation; make V.B. available for the completion of the full initial evaluations proposed by RPS; enter an order granting judgment in RPS' favor; and, provide RPS with additional relief as the Court deems appropriate. (ECF No. 1, at 21.)

V.B. was served on October 12, 2024. (ECF No. 5.) V.B., by and through Parent, proceeds before this Court *pro se*. V.B.'s answer to the Complaint was due on November 4, 2024. On March 6, 2025, RPS filed the Administrative Record, (ECF Nos. 8, 9), and an accompanying Motion to Seal the Administrative Record, (ECF No. 7), which the Court granted, (ECF No. 12).

On April 8, 2025, five months after V.B.'s answer deadline and nearly six months after RPS filed its Complaint, the Court issued an Order explaining that V.B. had not filed a response to the Complaint and that RPS had not moved for entry of default against V.B.  The Court also ordered the parties to file responsive pleadings.  (ECF No. 13, at 1.)

On April 14, 2025, RPS filed its Motion for Judgment on the Administrative Record. (ECF No. 14.)  V.B. did not timely respond.  *See* E.D. Va. Loc. R. 7(F)(1).  On June 16, 2025, V.B. filed her Motion to Dismiss.  (ECF Nos. 16, 17.)  In the Motion to Dismiss, V.B. argued that:  (1) RPS failed to state a claim upon which relief can be granted under Rule 12(b)(6); (2) RPS' allegations were conclusory, lacked factual foundation, and were brought in bad faith; (3) RPS "engaged in unethical litigation practices, including retaliatory filings and fee inflation, violating both the [IDEA] and general standards of professional conduct"; and, (4) the legal representation retained by RPS "materially compromised the integrity of the judicial process through intentional overbilling, *prima facie* fraud, and obstruction of due process."  (ECF No. 16, at 1–2.)  On June 30, 2025, RPS responded to the Motion to Dismiss.  (ECF No. 18.)  To date, V.B. has not replied to RPS' response to her Motion to Dismiss nor has she separately addressed the Motion for Judgment on the Administrative Record.  As discussed below, because V.B. proceeds *pro se*, and because V.B. did not file a formal response to RPS' Motion for Judgment on the Administrative Record, the Court liberally construes V.B.'s Motion to Dismiss as a response to RPS' Motion.

On October 21, 2025, this Court entered an Order explaining to Parent that "an opposing party filed a Motion for Judgment on the Administrative Record that, if granted, could result in the dismissal of some or all of [V.B.'s] claims."  (ECF No. 19, at 1.)  The Court then advised that V.B. was entitled to file a response opposing the Motion for Judgment on the Administrative

Record within twenty-one days. (ECF No. 19, at 1.) V.B.'s deadline to respond to the Motion for Judgment on the Administrative Record has passed.

On October 22, 2025, this Court notified V.B. that an opposing party "filed a Response to Defendant's Motion to Dismiss," and that VB was "entitled to file a reply to Plaintiff's response within six (6) days of the filing date of th[e] [Court's] Notice." (ECF No. 20, at 1.) All Court-ordered deadlines have long since elapsed.

On March 31, 2026, the Court granted in part and denied in part RPS' Motion for Judgment on the Administrative Record. (ECF No. 21.) The Court granted RPS' Motion with respect to its argument that Hearing Officer Mitchell awarded improper relief in ordering independent educational evaluations of V.B. The Court denied RPS' remaining arguments. The Court also denied V.B.'s Motion to Dismiss. (ECF No. 21, at 1–2.)

## II. Standard of Review

"Although IDEA cases are original civil actions, they are adjudicated based upon the record developed in the administrative proceedings." *C.D. v. Arlington Cnty. Sch. Bd.*, No. 1:23-cv-1627 (LMB), 2025 WL 350222, at *6 (E.D. Va. Jan. 30, 2025) (citing *Cnty. Sch. Bd. of Henrico Cnty. v. Z.P. ex rel. R.R.*, 399 F.3d 298, 309 n.7 (4th Cir. 2005)), *aff'd on other grounds*, 2026 WL 579466 (4th Cir. Mar. 2, 2026). Accordingly, judicial review "may be conducted on the administrative record even if there are disputed issues of material fact." *Indep. Sch. Dist. No. 283 v. S.D.*, 88 F.3d 556, 561 (8th Cir. 1996).

A district court reviewing a hearing officer's decision under the IDEA "is obliged to conduct a modified *de novo* review, giving due weight to the underlying administrative proceedings." *MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 530–31 (4th Cir. 2002) (quotation omitted). In reviewing the administrative record, courts must give due weight

20

to the hearing officer's factual findings because the hearing officer had "the opportunity to hear the testimony and assess the weight and credibility of the witnesses." *C.D.*, 2025 WL 350222, at *7 (citing *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 104–05 (4th Cir. 1991)).

Under this standard, "a hearing officer's findings of fact are entitled to be considered *prima facie* correct," *E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 517 (4th Cir. 2014) (quotation omitted), so long as they are "regularly made," *J.P. ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty., Va.*, 516 F.3d 254, 259 (4th Cir. 2008). *See also Z.P.*, 399 F.3d at 305. "Factual findings are not regularly made if 'they are reached through a process that is 'far from the accepted norm of a fact-finding process.'" *Z.P.*, 399 F.3d at 305 (quoting *Doyle*, 953 F.2d at 104). "In the Fourth Circuit, administrative findings are regularly made if 'the hearing officer conducted a proper hearing, allowing the parents and the School Board to present evidence and make arguments, and the hearing officer by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case.'" *C.D.*, 2025 WL 350222, at *13 (quoting *J.P.*, 516 F.3d at 259).

A district court that does not follow administrative findings must explain why. *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 325 (4th Cir. 2004) (citing *Doyle*, 953 F.2d at 105). While a district court owes deference to a hearing officer's regularly-made factual findings, a hearing officer's conclusions of law do not merit the same level of deference. A district court "draws its own legal conclusions *de novo*." *Alexis v. Bd. of Educ. for Baltimore Cnty. Pub. Schs.*, 286 F. Supp. 2d 551, 556 (D. Md. 2003) (citing *Doyle*, 953 F.2d at 105).

The party challenging the decision of the hearing officer bears the burden of establishing that a hearing officer's decision was erroneous. *Barnett ex rel. Barnett v. Fairfax Cnty. Sch. Bd.*,

927 F.2d 146, 152 (4th Cir. 1991), *cert denied*, 502 U.S. 859 (1991).  The challenging party also bears the burden of proving that a hearing officer's factual findings were not "regularly made." *C.D.*, 2025 WL 350222, at *7.

### III.  Analysis

RPS argued that Hearing Officer Mitchell erred on four grounds.  First, RPS contended that Hearing Officer Mitchell provided V.B. with improper relief from RPS' IDEA violations by ordering independent educational evaluations of V.B. rather than ordering RPS to conduct those evaluations.  Second, RPS insisted Hearing Officer Mitchell erred in determining that RPS failed to provide V.B. with the protections guaranteed by the IDEA.  Third, RPS asserted that Hearing Officer Mitchell incorrectly concluded that V.B.'s behavioral conduct was a manifestation of her disability.  Finally, RPS argued that Hearing Officer Mitchell's determination that RPS violated its Child Find obligations was not "regularly made" under the IDEA.

The Court granted RPS' Motion in part with respect to its argument that Hearing Officer Mitchell awarded improper relief in ordering independent educational evaluations of V.B.  RPS has a statutory right to conduct those evaluations rather than independent evaluators.  The Court denied RPS' remaining arguments because Hearing Officer Mitchell's decisions were regularly made and supported by law.  (ECF No. 21.)

In V.B.'s Motion to Dismiss, she asserted that RPS failed to state a claim and sought sanctions for RPS' alleged improper conduct.  Because of her *pro se* status, the Court construed V.B.'s Motion to Dismiss as a response to RPS' Motion for Judgment on the Administrative Record.  But the Court denied V.B.'s motion because it contained only conclusory arguments concerning RPS' Motion, and therefore failed to alter the Court's grant in part and denial in part of RPS' Motion.  (ECF No. 21.)

22

**A.    Count I:**
**The Court Granted RPS' Motion in Part Because the Hearing Officer**
**Improperly Ignored RPS' Obligation to Evaluate V.B. When Ordering**
**Independent Evaluators to Conduct an Initial Evaluation**

RPS first argued that Hearing Officer Mitchell awarded V.B. improper relief as a result of RPS' IDEA violations.[19] Hearing Officer Mitchell concluded that RPS violated its Child Find obligations by failing to refer V.B. to Child Study in a reasonable time. (AR, at 996.) Hearing Officer Mitchell ultimately ordered two phases of relief with respect to RPS' Child Find violation: Hearing Officer Mitchell (1) referred V.B. "to an [independent] eligibility team to determine if she was eligible for special education services based on existing data"; and (2) ordered that, if RPS did not receive results from that independent evaluation within a specified time frame, RPS would conduct this evaluation itself. (AR, at 997.) RPS insisted that Hearing Officer Mitchell's order that RPS "proceed with an eligibility determination based only on (1) existing data and (2) independent evaluations" is relief "contrary to the IDEA." (ECF No. 15, at 16.) The Court agreed that Hearing Officer Mitchell ordered improper relief.

RPS asserted that it has "a statutory right to conduct its own evaluation of a student before finding a student eligible under the IDEA." (ECF No. 15, at 17.) The plain language of the IDEA supports this interpretation. The IDEA provides that a "*State educational agency . . . or local educational agency shall* conduct a full and individual initial evaluation . . . before the initial provision of special education and related services to a child with a disability." 20 U.S.C. § 1414(a)(1)(A) (emphasis added). The IDEA is replete with mandatory language dictating what actions SEAs or LEAs must take. *See, e.g., id.* § 1414(c)(2) (providing that "[t]he [SEA or LEA]

---

[19] RPS' first Count concerns only the relief awarded by Hearing Officer Mitchell, rather than the propriety of Hearing Officer Mitchell's underlying determination that RPS violated the IDEA such that relief was appropriate. RPS' subsequent Counts contested Hearing Officer Mitchell's underlying determinations, which the Court addressed separately.

23

shall administer . . . other evaluation measures as may be needed") (emphasis added). The clear language of the IDEA provides that any initial evaluation of a student should be undertaken by RPS first, rather than by an independent evaluator.

To be sure, the IDEA also provides that state educational agencies must "maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards." 20 U.S.C. § 1415(a). Indeed, the IDEA requires state educational agencies to maintain procedures providing "[a]n opportunity for the parents of a child with a disability . . . to obtain an independent educational evaluation of the child." *Id.* § 1415(b)(1). But, as identified earlier, parents' entitlement to an independent evaluation is not boundless. The regulations implementing the IDEA "clarify this entitlement by providing that a 'parent has the right to an independent educational evaluation at public expense *if the parent disagrees with an evaluation obtained by the public agency.*'" *Schaffer*, 546 U.S. at 60–61 (emphasis added) (quoting 34 C.F.R. § 300.502(b)(1)). That is, a parent obtains an entitlement to an independent initial evaluation of their child only *after* a state educational agency first performs its own evaluation.[20]

The case law cited by RPS confirms the Court's interpretation of the IDEA. RPS relies on *Torda ex rel. Torda v. Fairfax County* to support its entitlement to conduct an initial evaluation of V.B., rather than an independent evaluator. (ECF No. 15, at 17 (citing No. 1:11-cv-193 (GBL), 2012 WL 2370631 (E.D. Va. June 21, 2012)).) In *Torda*, the court observed that "if a student's parents want him [or her] to receive special education under the IDEA, they must

---

[20] The Court's interpretation of the IDEA also comports with Virginia state regulations implementing the IDEA. Those regulations provide, for example, that "[e]ach *local school division* shall maintain an active and continuing child find program designed to . . . evaluate . . . children . . . who are in need of special education." 8 Va. Admin. Code § 20-81-50 (emphasis added).

allow the school itself to reevaluate the student and they cannot force the school to rely solely on an independent evaluation." 2012 WL 2370631, at *8 (quotation omitted).

The *Torda* court interpreted provisions of the IDEA concerning a school's entitlement to conduct a *reevaluation* of a student's eligibility for special education services, rather than a school's entitlement to conduct an *initial* evaluation of the same. But the IDEA's provisions concerning a school's right to conduct its own reevaluations contain the same mandatory language as those provisions entitling a school to conduct its own initial evaluations. *Compare* 20 U.S.C. § 1414(a)(2)(A) (providing that "[a] *local educational agency shall* ensure that a reevaluation of each child with a disability" is conducted in accordance with other statutory provisions) (emphasis added), *with* 20 U.S.C. § 1414(a)(1)(A) (providing that "[a] *State educational agency . . . or local educational agency* shall conduct a full and individual initial evaluation"). The plain text of the IDEA consistently provides the *school* with the obligation and right to conduct an initial evaluation. *See also Andress v. Cleveland Indep. Sch. Dist.*, 64 F.3d 176, 179 (5th Cir. 1995) ("[T]here is no exception to the rule that a school district has a right to test a student itself in order to *evaluate or reevaluate* the student's eligibility under IDEA.") (emphasis added). Accordingly, Hearing Officer Mitchell improperly ordered V.B. to undergo initial evaluations conducted by *independent* evaluators. The IDEA affords RPS the right to perform those initial evaluations first.

RPS also insists that Hearing Officer Mitchell erred by ordering that any initial evaluation of V.B. be conducted "based only on existing data." (ECF No. 15, at 15.) The Court reads Hearing Officer Mitchell's order differently. Her order referred V.B. for an initial evaluation "to determine if she is eligible for special education services *based on existing data*." (AR, at 997 (emphasis added).) But Hearing Officer Mitchell's order merely explains that her

25

decision to refer V.B. for an evaluation was predicated on the existing data underlying her decision; it does not order that *subsequent* evaluations of V.B. rely solely on that data. Importantly, Hearing Officer Mitchell also ordered that, if independent evaluators failed to conduct an initial evaluation within a particular time frame, "RPS will conduct the evaluations that were ordered in the interim order dated August 8, 2024." (AR, at 997.) That order in turn provided that evaluations of V.B. would consist of "sociocultural, psychological and speech" evaluations, which V.B. had not yet undergone. (AR, at 1009.) That is, Hearing Officer Mitchell's order contemplated that evaluations would occur beyond "existing data." It would be incongruous to read Hearing Officer Mitchell's order to require both an evaluation "based on existing data" and evaluations not based on such data. Accordingly, the Court interprets Hearing Officer Mitchell's order *not* to provide that RPS, upon conducting its initial evaluation, must rely solely on existing data.[21]

Hearing Officer Mitchell improperly ordered V.B. to undergo independent evaluations to determine her eligibility for special education services. RPS is entitled to conduct those evaluations first and need not rely solely on existing data in doing so. The Court will therefore grant RPS' Motion with respect to Count One.

---

[21] RPS also argued that because Parent and V.B. failed to participate in the initial evaluations that RPS sought to perform, RPS cannot be held at fault for violations of its obligation to conduct such an evaluation. (ECF No. 15, at 18.) Because the Court determines that Hearing Officer Mitchell otherwise awarded improper relief, the Court need not address this argument. But the Court observes, as have other courts, that a parent's failure to participate in IDEA procedures is not grounds for faulting a school's failed attempt to carry out those procedures. *See MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 535 (4th Cir. 2002) (finding that "it would be improper to hold [the] School [Board] liable for [a] procedural violation" when the procedural violation "was the result of [a parent's] lack of cooperation.").

**B. Count II:**
**The Court Denied RPS' Motion in Part Because the Hearing Officer**
**Correctly Concluded that RPS Denied V.B. the Protections to Which She**
**Was Entitled Under the IDEA**

RPS next asserted that Hearing Officer Mitchell incorrectly concluded that RPS failed to provide V.B. with the protections she was owed under the IDEA. (ECF No. 15, at 19.) The Court disagreed.

As discussed above, one such protection under the IDEA is a Manifestation Determination Review, in which a school and parents evaluate a student's violation of a code of conduct and determine whether that violation was a manifestation of a disability. As RPS correctly argued, "[t]he relevant disciplinary protection" in this matter is an MDR. (ECF No. 15, at 19.) Schools must conduct an MDR when two conditions are met: (1) the school must have knowledge that the student was a child with a disability, 20 U.S.C. § 1415(k)(5)(B); and (2) the school must have made a "decision to change the placement of a child with a disability because of a violation of a code of student conduct," *id.* § 1415(1)(E)(i).

RPS properly conducted an MDR after V.B. was suspended for striking her teacher in February 2024. But Hearing Officer Mitchell concluded that RPS failed to provide V.B. with the protections of the IDEA because RPS (1) had knowledge that V.B. was a child with a disability *prior* to her February 2024 suspension and (2) had made a decision to change V.B.'s placement *prior* to that same suspension. Because both conditions requiring an MDR were met, and because RPS failed to conduct such an MDR before February 2024, Hearing Officer Mitchell properly determined that RPS failed to provide V.B. with the protections of the IDEA.

### 1.    Hearing Officer Mitchell Correctly Concluded that RPS had Knowledge that V.B. was a Child with a Disability Prior to her Suspension in February 2024

According to Hearing Officer Mitchell, "RPS did not afford [V.B.] the protections of 34 C.F.R. § 300.534 until a MDR was conducted on March 1, 2024, following an incident when [V.B.] hit her teacher on February 28, 2024 that resulted in a 10 day suspension." (AR, at 990.) RPS maintains that because it conducted an MDR after suspending V.B. for striking her teacher, it provided V.B. with the protections required by the IDEA. (ECF No. 15, at 19–20.) But RPS ignores that Hearing Officer Mitchell determined that V.B. should have been afforded the protections of the IDEA *before* RPS provided V.B. with the MDR related to her striking her teacher.

If a school engages in a disciplinary action for a student's violation of a code of conduct, the school must provide the student with an MDR concerning that disciplinary action when the school "had knowledge . . . that the child was a child with a disability before the behavior that precipitated the disciplinary action occurred." 34 C.F.R. § 300.534(a). Hearing Officer Mitchell properly determined that RPS had knowledge that V.B. was a child with a disability. Hearing Officer Mitchell explained that "[f]rom the beginning of school," Teacher Wilson "noticed [V.B.'s] behavioral problems," and those problems "were communicated . . . to Carver supervisory personnel." (AR, at 989.) Hearing Officer Mitchell further noted that Parent "alerted" RPS to V.B.'s disability "at the beginning of the school year." (AR, at 989.) Relying on these facts, Hearing Officer Mitchell concluded that "RPS [was] deemed to have had knowledge" that V.B. was "a child with a disability." (AR, at 991.) As a result, the protections of the IDEA, including the requirement that V.B. receive an MDR after experiencing disciplinary actions, applied to V.B.

28

### 2. Hearing Officer Mitchell Correctly Concluded that RPS had Changed V.B.'s Placement such that RPS was Required to Conduct an Earlier MDR

Even if RPS had knowledge that V.B. was a child with a disability, it was required to conduct an MDR only if it had made a "decision to change [V.B.'s] placement" "because of a violation of a code of student conduct." 20 U.S.C. § 1415(k)(1)(E)(i). RPS acknowledged that a "change in placement" occurred when it suspended V.B. for striking her teacher, and therefore asserted that it properly conducted an MDR regarding that suspension on March 1, 2024. (ECF No. 15, at 19–20.) But because Hearing Officer Mitchell properly determined that RPS had knowledge of V.B.'s disability well before V.B.'s suspension for striking her teacher, any disciplinary action "changing her placement" prior to that suspension would have required an *earlier* MDR.

As discussed above, RPS must conduct an MDR "within 10 school days of any decision to change [a student's] placement." 20 U.S.C. § 1415(k)(1)(E)(i). According to Hearing Officer Mitchell, V.B. was repeatedly suspended from Carver *prior* to the February 28, 2024 incident, resulting in her missing more than ten days of school. (AR, at 991.) Hearing Officer Mitchell determined that "the accumulation of days for the short-term suspensions amount[ed] to a change in placement," such that RPS was required to conduct an MDR for this earlier "change in placement." (AR, at 991.) That is, while RPS properly conducted an MDR with respect to V.B.'s February 2024 suspension for striking her teacher, Hearing Officer Mitchell concluded that RPS was obligated to conduct at least one additional MDR with respect to V.B.'s earlier suspensions.

The IDEA does not define what constitutes a "change in placement."[22]  The United States Supreme Court has determined that a suspension of greater than ten days may constitute a "change in placement." *Honig v. Doe*, 484 U.S. 305, 326, 328–29 (1988).  Here, V.B. was suspended "one to three days, five or six times." (AR, at 991.)  These successive short-term suspensions may still constitute a "change in placement" that warranted an MDR.  As the United States District Court for the District of Maryland has concluded, "a fundamental change in, or elimination of a basic element of, the educational program, which adversely affects the child's learning experience in a significant way, is what constitutes a 'change in educational placement' for purposes of the IDEA." *Cavanagh v. Grasmick*, 75 F. Supp. 2d 446, 466–67 (D. Md. 1999).  Applying that formulation,[23] the Court concludes that V.B.'s repeated suspensions[24] "adversely affect[ed] [her] learning experiences in a significant way," such that these suspensions prior to the February 28, 2024 incident constituted a "change in placement" warranting an MDR review.

—————————————

[22] Virginia regulations suggest that a state educational agency has some say in determining whether a "change in placement" has occurred.  8 Va. Admin. Code § 20-81-160(B)(1)(b)(2).  But RPS confines its argument as to whether V.B. was afforded the protections of the IDEA to the *federal* regulatory standard.  The Court therefore does the same.

[23] Hearing Officer Mitchell did not apply the formulation in *Cavanagh* in determining whether V.B.'s suspensions constituted a "change in placement."  However, whether disciplinary action taken against a student constitutes a "change in placement" is a question of law which the Court addresses on *de novo* review.  *See Cavanagh*, 75 F. Supp. 2d at 466 (concluding "as a matter of law" that disciplinary actions taken were "changes in placement").

[24] Hearing Officer Mitchell acknowledged some dispute on the record as to whether V.B. had actually been suspended prior to the February 28, 2024 incident.  (AR, at 990.)  Parent testified during the hearing that V.B. had been repeatedly suspended for short periods, but Hearing Officer Mitchell noted that V.B.'s attendance record was "conspicuously incomplete . . . making it unclear whether [V.B.'s] dismissals were considered suspensions . . . by RPS." (AR, at 990.)  But Hearing Officer Mitchell ultimately credited Parent's testimony that V.B. was in fact repeatedly suspended. (AR, at 990.)  The Court owes this factual determination deference, as it was regularly made.

30

Because RPS did not conduct a timely MDR consistent with this change in placement, it did not provide V.B. with the protections to which she was entitled under the IDEA and its implementing regulations. Hearing Officer Mitchell correctly reached this conclusion. The Court therefore denied RPS' Motion with respect to Count Two.

**C.**     **Count III:**
       **The Court Denied RPS' Motion in Part Because Hearing Officer Mitchell**
       **Correctly Concluded that V.B.'s Conduct Was a Manifestation of Her**
       **Disability**

RPS also challenged Hearing Officer Mitchell's decision that V.B.'s conduct in striking Teacher Wilson on February 28, 2024 was a manifestation of her disability. (ECF No. 15, at 20.) In making this determination, Hearing Officer Mitchell discounted the results of the March 1, 2024 MDR, which determined that V.B.'s conduct was *not* a manifestation of her disability. (AR, at 990.) RPS argued that, during the hearing, it "elicited testimony from two educational experts . . . regarding the [March 1, 2024] MDR meeting, the data considered at the meeting, and the basis for the MDR team's determination that V.B.'s conduct . . . was not a manifestation of her disability." (ECF No. 15, at 20.) RPS contended that by rejecting this evidence, particularly given that "Parent did not produce any contrary evidence regarding the MDR results," Hearing Officer Mitchell did not resolve the question of whether V.B.'s conduct was a manifestation of her disability in "a regular way," and instead "flipped a coin" to reach her determination. (ECF No. 15, at 20–21 (quotation and emphasis omitted).) RPS' argument that Hearing Officer Mitchell's conclusion was not "regularly made" was unavailing.

The IDEA requires the parties to an MDR to review "all relevant information in the student's file" and "any relevant information provided by the parents" to determine "if the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability." 20 U.S.C. § 1415(k)(1)(E)(i); *see also* 34 C.F.R. § 300.530(e)(1)(i) (same); *Sampson*

31

*Cnty. Bd. of Educ. v. Torres*, 717 F. Supp. 3d 474, 488 (E.D.N.C. 2024) ("[T]he statute is worded broadly, requiring consideration of all relevant information . . . and it does not restrict the MDR team to considering only the description or findings already made by any disciplinary personnel or investigation.") (quotation omitted). "Due weight" must be given to Hearing Officer Mitchell's findings with respect to whether V.B.'s conduct was a manifestation of her disability so long as those findings were regularly made. *Sampson*, 717 F. Supp. 3d at 489.

Nothing "in the record suggest[s] that the [H]earing [O]fficer's process in [determining that V.B.'s conduct was a manifestation of her disability] was anything other than ordinary." *J.P.*, 516 F.3d at 259. Hearing Officer Mitchell properly considered the testimony of RPS' experts, including those experts' testimony about the reasoning in the March 1, 2024 MDR concluding that V.B.'s conduct was not a manifestation of her disability.[25] While RPS' expert testified that, in the view of the March 1, 2024 MDR, V.B.'s conduct was not a manifestation of her disability, (AR, at 576:24–577:6, 980), Hearing Officer Mitchell found the MDR results "questionabl[e]" given V.B.'s extensive behavioral history, (AR, at 990). RPS asserts that Hearing Officer Mitchell "explicitly found [ICC] Pitts to be a credible[] expert witness[] but inexplicably chose to 'not accept the MDR results.'" (ECF No. 15, at 22.) But Hearing Officer Mitchell's decision was entirely explicable. She conducted a proper hearing, allowing Parent and RPS to present evidence and make arguments, and Hearing Officer Mitchell resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating her responsibility to decide the case.

---

[25] For example, ICC Pitts explained that the parties at the March 1, 2024 MDR considered V.B.'s conduct during the incident with Teacher Wilson on February 28, 2024, the incidents listed on V.B.'s OHI worksheet, ICC Pitts' prior experiences with other students with ADHD, and V.B.'s behavior during the 2023–2024 school year. (AR, at 573–74, 981.)

32

Hearing Officer Mitchell did not explain whether she found RPS' expert testimony persuasive. But hearing officers are "not require[d] . . . to offer a detailed explanation of [their] credibility assessments." *J.P.*, 516 F.3d at 261. And given Hearing Officer Mitchell's determination that she would not accept the March 1, 2024 MDR results because of V.B.'s extensive behavioral history, even after hearing RPS' expert testimony, "it is apparent that [] [H]earing [O]fficer [Mitchell] in fact found" the evidence in favor of V.B.'s manifestation determination "more persuasive." *Id.* "Such implicit credibility assessments are as entitled to deference . . . as explicit findings." *Id.* (quotation omitted).

Hearing Officer Mitchell's determination that V.B.'s conduct was a manifestation of her disability was regularly made. The Court therefore denied RPS' Motion with respect to Count Three.

**D.    Count IV:**
**The Court Denied RPS' Motion in Part Because the Hearing Officer**
**Correctly Concluded that RPS Violated its Child Find Obligations**

Finally, RPS challenged Hearing Officer Mitchell's finding that RPS violated its Child Find duty under the IDEA. (ECF No. 15, at 23.) Hearing Officer Mitchell concluded that RPS failed to refer V.B. to Child Study in a timely fashion. (AR, at 996.) According to RPS, Hearing Officer Mitchell's finding with respect to RPS' referral was not "regularly made" for two reasons: (1) Hearing Officer Mitchell failed to defer to RPS' credible expert testimony; and (2) Hearing Officer Mitchell improperly relied on records not admitted into evidence. (ECF No. 15, at 24–27.) RPS again failed to meet its burden and demonstrate that Hearing Officer Mitchell reached her decision in an abnormal or irregular way.

33

### 1.  Hearing Officer Mitchell Properly Weighed Expert Testimony such that her Decision was Regularly Made

RPS argued that the IDEA's "Child Find duty does not require school staff to *immediately* conclude that a student has a disability." (ECF No. 15, at 23 (emphasis in original).) RPS contended that "educators are permitted to implement school-based interventions prior to initiating the special education evaluation process." (ECF No. 15, at 23 (citation omitted).) RPS asserted that during the due process hearing, its expert witnesses provided testimony "regarding evidence-based interventions implemented for V.B." underlying its decision not to conclude that V.B. had a disability "immediately."[26] (ECF No. 15, at 24.)

Hearing Officer Mitchell ultimately rejected the weight of this testimony and concluded that RPS failed to refer V.B. to Child Study in a timely fashion. (AR, at 996.) According to RPS, Hearing Officer Mitchell's finding "could not have resulted from . . . properly weighing [RPS'] evidence regarding interventions or identification for special education against the Parent's countervailing evidence *because the Parent did not produce any evidence on this issue.*" (ECF No. 15, at 26 (emphasis in original).) RPS further asserted that in doing so, Hearing Officer Mitchell "fail[ed] to 'give deference to the decisions of professional educators.'" (ECF No. 15, at 26 (quoting *M.M. ex rel. D.M.*, 303 F.3d at 533).

"[A]t all levels of an IDEA proceeding, the opinions of the professional educators are entitled to respect." *Z.P.*, 399 F.3d at 307. But "[t]he respect and deference that must be accorded to those professional opinions, however, does not give a district court license to ignore

---

[26] ICC Pitts provided testimony regarding the tiered interventions Carver sought to implement before evaluating V.B. for special education services. (AR, at 979.) Assistant Principal Harris-Jones, who oversaw the SBIT team at Carver, offered a comprehensive chronology of how she and Teacher Wilson implemented the tiered intervention system to help V.B. acclimate to Carver. (AR, at 981–85.)

34

the requirement . . . that the findings of the *administrative proceeding* must be given due weight." *Id.* (emphasis in original). And Hearing Officer Mitchell's weighing of the evidence, including her determination that she gave little weight to RPS' expert testimony, is a factual determination entitled to deference. Indeed, "the mere fact that the hearing officer accepted the evidence of parents over that of the School Board is not a reason to reject the hearing officer's findings." *Id.* Hearing Officer Mitchell was not required "[t]o give deference only to the decision of [RPS]," as to do so "would render meaningless the entire process of administrative review." *School Bd. of Prince William Cnty., Va v. Malone*, 762 F.2d 1210, 1217 (4th Cir. 1985).

The Court was also unpersuaded by RPS' assertion that Parent "did not produce any evidence on this issue." (ECF No. 15, at 26.) A review of Hearing Officer Mitchell's decision makes clear that she relied on the entirety of the administrative record, including Parent's and Grandparent's testimony. (AR, at 992–96.) Accordingly, Hearing Officer Mitchell's conclusions were "regularly made," in that she properly weighed RPS' expert testimony and the evidence before her.

### 2.    Hearing Officer Mitchell's Reliance on Records Not Admitted into Evidence did not Render Her Decision Irregularly Made

RPS further argued that Hearing Officer Mitchell's Child Find determination was not "regularly made" because she improperly based her finding on records that were not admitted into evidence at the due process hearing, thereby rendering her Child Find determination irregularly made. (ECF No. 15, at 26–27.).

RPS noted that, in concluding that RPS violated its Child Find obligation, Hearing Officer Mitchell relied in part on "TDT's suspicion" that V.B. had both ADHD and Oppositional Defiant Disorder. According to RPS, Hearing Officer Mitchell learned of these suspicions

35

through V.B.'s SUCCOR records, "which document an ADHD diagnosis and reflect numerous behavioral concerns." (ECF No. 15, at 26.) RPS contended that these records were not introduced into evidence by RPS or Parent and were never made part of the due process hearing record. (ECF No. 15, at 27.)

RPS cites no statute, regulation, or caselaw to support the proposition that Hearing Officer Mitchell's reliance on this evidence was so "far from the accepted norm of a fact-finding process" that her conclusion was not "regularly made." *Z.P.*, 399 F.3d at 305 (quotation omitted). Indeed, Hearing Officer Mitchell's conclusion that RPS failed to refer V.B. to Child Study in a timely fashion was otherwise amply supported by evidence in the record. Because Hearing Officer Mitchell's conclusion that RPS violated its Child Find obligations was regularly made, the Court denied RPS' Motion with respect to Count Four.[27]

---

[27] RPS argued before this Court only that Hearing Officer Mitchell's conclusion was not regularly made. RPS does not challenge the merits of Hearing Officer Mitchell's Child Find conclusion. There is no standard included in the IDEA nor its implementing regulations governing how quickly a school district must act, and the Fourth Circuit has not imposed such a standard.

The Court acknowledges that the administrative record includes some explanation that RPS did not necessarily delay its referral of V.B. unreasonably. For example, Carver may have had limited resources and had to balance V.B.'s evaluation process with other students' needs. (AR, at 979.) RPS' approach to evaluating V.B. was also informed by V.B.'s youth. RPS notes that V.B. was only in kindergarten while attending Carver, and the Child Find team needs "a whole picture of the student (especially a kindergarten student) before giving them the special education label." (AR, at 979.) Finally, Carver's winter break occurred during the evaluation process and may have contributed to RPS' alleged delay in evaluating V.B. (AR, at 979.) But nothing in the record shows that V.B.'s referral or evaluations could not have taken place during this break. For instance, the record indicates that RPS was prepared to conduct V.B.'s evaluations during her suspension in February 2024.

Ultimately, even if these facts *could* support the conclusion that RPS did not engage in an unreasonable delay, the Court is not entitled to re-weigh evidence before a hearing officer. The Court concludes that Hearing Officer Mitchell's Child Find determination was regularly made. Certainly, the record strongly supports the findings made. Accordingly, her factual findings are deserving of deference.

36

**E.    The Court Construed V.B.'s Motion to Dismiss as a Response to RPS'
Motion for Judgment on the Administrative Record and Denied V.B.'s *Pro
Se* Countersuit for Sanctions, Damages, and Ethical Violations**

On June 16, 2025, V.B. filed a *pro se* Motion to Dismiss under Federal Rule of Civil

Procedure 12(b)(6).  (ECF Nos. 16, 17.)  V.B. has not filed a formal response to RPS' Motion for

Judgment on the Administrative Record.  "[L]ong-standing practice" allows a court "to construe

*pro se* pleadings liberally."  *Hill v. Braxton*, 277 F.3d 701, 707 (4th Cir. 2002).  Because both

RPS' Motion for Judgment on the Administrative Record and V.B.'s *pro se* Motion to Dismiss

seek the Court's ruling on the Counts listed in RPS' Complaint, the Court liberally construes the

Motion to Dismiss as a response to RPS' Motion for Judgment on the Administrative Record.

Even when the Court construes the Motion to Dismiss as responsive to RPS' Motion, V.B.

utterly fails to alter the Court's conclusions with respect to RPS' Motion.

In her Motion to Dismiss, V.B. argued that:  (1) RPS failed to state a claim upon which

relief can be granted under Rule 12(b)(6); (2) RPS' allegations were conclusory, lacked factual

foundation, and were brought in bad faith; (3) RPS "engaged in unethical litigation practices";

and, (4) the legal representation retained by RPS has "materially compromised the integrity of

the judicial process through intentional overbilling, *prima facie* fraud, and obstruction of due

process." (ECF No. 16, at 1–2.)  V.B. added grounds for dismissal that included fraud upon the

Court, contempt of the Hearing Officer's Order, and unauthorized action and retaliatory filing.

(ECF No. 16, at 2–3.)  V.B.'s Motion to Dismiss also included a "Counterclaim for Sanctions"

seeking "$5,000,000, to be . . . [paid by] RPS and its retained counsel." (ECF No. 16, at 3.)

But V.B. offers no support for any of these claims.  Even when construed liberally,

V.B.'s conclusory Motion to Dismiss offered no insight into the issues raised in RPS' Complaint

or Motion and therefore did not alter the Court's conclusions with respect to RPS' Motion.  The

Court therefore appropriately denied the Motion to Dismiss and properly considered RPS' Motion.[28]

The Court also denied V.B.'s request for sanctions. Federal Rule of Civil Procedure 11 plainly requires that a motion for sanctions "be made separately from any other motion." Fed. R. Civ. P. 11(c)(2). V.B.'s request for sanctions contained similarly conclusory allegations as did her Motion to Dismiss, *and* the request was embedded within that Motion to Dismiss. Because V.B. failed to separate her two motions, the Court denied the request for sanctions.[29]

### F. The Court Ordered the Parties to Provide Supplemental Briefing on the Appropriate Remedy

As discussed above, the Court granted RPS' Motion for Judgment on the Administrative Record with respect to Count One. In its prayer for relief, RPS asked the Court to "[r]everse and vacate the Hearing Officer's" decision and to "[o]rder that . . . Parent fully cooperate with [RPS] and make V.B. available for the completion of the full initial evaluations proposed by [RPS]." (ECF No. 1, at 21.)

RPS provided no authority establishing the Court's authority to provide this relief. Indeed, the Fourth Circuit has explained that a district court reviewing an IDEA claim "cannot

---

[28] Even where the Court addresses V.B.'s Motion to Dismiss on its own merits, rather than as a response to RPS' Motion, the Court would have to deny the Motion to Dismiss as untimely. Under Federal Rule of Civil Procedure 12, a defendant "must serve an answer" or other responsive pleading "within 21 days after being served with the summons and complaint." Fed. R. Civ. P. 12(a)(1)(A)(i). V.B. was served on October 12, 2024, (ECF No. 5), and her answer or Rule 12 motion was due 21 days thereafter, by November 4, 2025. V.B. filed the Response on June 16, 2025, well after the 21-day deadline established by Rule 12(a)(1)(A)(i).

[29] RPS also requested that the Court strike the Motion to Dismiss, (ECF No. 16), pursuant to Federal Rule of Civil Procedure 12(f) because it failed to comply with the Local Rule 7 of the Eastern District of Virginia. (ECF No. 18, at 8.) Local Rule 7(F) provides that all motions must be accompanied by a written brief "unless otherwise directed by the Court." E.D. Va. Local R. 7(F). Given V.B.'s *pro se* status, the Court denied RPS' request to strike the Motion to Dismiss on that basis.

affirm, reverse, vacate, or remand the state hearing officer's decision." *G.M. by E.P. v. Barnes*, 114 F.4th 323, 330 (4th Cir. 2024). Moreover, to the extent RPS seeks equitable relief, the Court may ordinarily provide such relief only when it determines that a school has denied a student a free and appropriate public education. *See G.T. v. Bd. of Ed. of Cnty. of Kanawha*, 117 F.4th 193, 199 (4th Cir. 2024); *but see* 20 U.S.C. § 1415(i)(2)(C)(iii) (providing that a court "shall grant such relief as the court determines is appropriate").

Because RPS has not demonstrated its entitlement to the remedy it seeks, the Court ordered the parties to provide supplemental briefing concerning the Court's authority to order that relief. (ECF No. 21, at 1–2.) The Court ordered RPS to file, no later than fourteen (14) days from the date of entry of this Memorandum Opinion, "supplemental briefing explaining the legal basis for its entitlement to the remedies it seeks under Count One." (ECF No. 21, at 2.) The Court further ordered that V.B. may file a response to RPS' supplemental briefing "no later than ten (10) days from the date RPS files its supplemental brief." (ECF No. 21, at 2.)

## IV. Conclusion

For the reasons articulated above, the Court denied in part RPS' Motion for Judgement on the Administrative Record. (ECF No. 14.) The Court granted the Motion with respect to Count One but ordered RPS to provide supplemental briefing as to the Court's ability to order the relief RPS seeks. The Court denied the Motion with respect to Counts Two, Three, and Four.

The Court denied each of the requests presented in V.B.'s Response, (ECF Nos. 16, 17), and denied RPS' request for the Court to strike V.B.'s Response, (ECF No. 18).

It is SO ORDERED. (*See* ECF No. 21.)

Date: 4/20/26
Richmond, Virginia

/s/
M. Hannah Lauck
Chief United States District Judge

39